**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| HANNAH M. BOWEN, | ) | CASE NO. 3:25-CV-1142 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.     INTRODUCTION

The Commissioner of Social Security denied Plaintiff Hannah M. Bowen's application for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income (SSI). Ms. Bowen seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated June 2, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.     PROCEDURAL HISTORY

In March 2022, Ms. Bowen applied to the Social Security Administration (SSA) seeking a period of disability, DIB, and SSI benefits; she claimed that she became disabled on May 6, 2017. (Tr. 422.)[1] She identified nine allegedly disabling conditions: (1) fibromyalgia; (2) chronic neck and back pain; (3) arthritis; (4) degenerative disc disease; (5) attention-deficit/hyperactivity

---

[1] The administrative transcript appears at ECF No. 6. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 46"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 7") and page-identification numbers (e.g., "PageID# 2405").

disorder; (6) "personality disorder"; (7) anxiety with panic attacks; (8) post-traumatic stress disorder; and (9) depressive disorder. (Tr. 504.)

The SSA denied Ms. Bowen's application initially and upon reconsideration. (Tr. 149, 150, 162, 175, 177, 178, 190, 202.) Ms. Bowen requested a hearing before an administrative law judge (ALJ). (Tr. 274.) Her counsel submitted a letter–brief in advance of the hearing. (Tr. 590–93.) The ALJ held a hearing on July 11, 2023, at which Ms. Bowen was represented by counsel. (Tr. 56–96.) Ms. Bowen testified, as did an independent vocational expert (VE). (*Id.*)

On August 29, 2023, the ALJ issued a written decision finding that Ms. Bowen is not disabled. (Tr. 203–19.) Ms. Bowen requested review of the ALJ's decision, and the Appeals Council ultimately remanded the case back to the ALJ. (Tr. 226–29, 352–53.) Specifically, the Appeals Council found that the ALJ had failed to evaluate apparent conflicts between the Dictionary of Occupational Titles and the VE's testimony. (*Id.*) The ALJ relied on a DOT code that does not exist, among other errors. (*Id.*)

The ALJ thereafter held a second hearing, on September 19, 2024. (Tr. 109–48.) Ms. Bowen testified again, as did a second VE. (*Id.*) On January 2, 2025, the ALJ issued a written decision finding that Ms. Bowen is not disabled. (Tr. 21–46.) Ms. Bowen requested review of the ALJ's decision. (Tr. 413–14.)  On February 14 and April 1, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1, 8.)

On June 2, 2025, Ms. Bowen filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Bowen asserts the following assignment of error for review:

> The ALJ failed to account for the state agency mental health experts' opinion regarding Ms. Bowen's ability to interact with others.

(Pl.'s Merit Br. at 7, ECF No. 7, PageID# 2405.)

### III.  BACKGROUND

#### A.  <u>Personal, Educational, and Vocational Experience</u>

Ms. Bowen was born in August 1987 and was 34 years old on the date of her application. (Tr. 62, 422.) She has a driver's license. (Tr. 62–63.)

Ms. Bowen testified that she worked as a licensed practical nurse for around six years and then earned her associate's degree in nursing in 2015. (Tr. 70; *see also* Tr. 63.) She said that as she was preparing to take her board examinations, she learned that her nursing license had been "rescinded." (*Id.*)

Ms. Bowen has held a number of jobs since then, often for short periods. She was a live-in caregiver for nearly a year. (Tr. 67) She worked as a waitress. (Tr. 68.) She worked as a forklift driver. (Tr. 69.) Her last job, which she held until around January 2022, was as a front desk attendant at a hotel. (Tr. 63–64.)

#### B.  <u>Function Report</u>

Ms. Bowen completed a function report on May 14, 2022. (Tr. 525.) She reported that she had recently started a new job, but her work was "getting difficult" due to chronic pain in her legs and back. (Tr. 531.) After a 12 hour shift, she can "barely walk out to [her] car." (*Id.*)

She wrote that her pain was "overbearing at times," which pain "sometimes makes [her] short tempered." (Tr. 525.) She described that her ADHD "increases [her] anxiety," causing her to "get a bit overwhelming to others with my impatience." (*Id.*) She complained that her doctors had denied her pain medicine and medicine for her ADHD and anxiety, treating her "like [she is] an addict" even though she had never abused pain medication. (*Id.*)

Ms. Bowen said that she can "barely lift 50 [pounds] anymore," especially with her left arm. (Tr. 530.) She can stand for "maybe an hour" before needing to sit. (*Id.*) She can walk for 20

3

to 30 minutes before needing to stop and rest. (*Id.*) She wears anti-embolism stockings every day to help with her leg pain. (Tr. 534.)

Ms. Bowen wrote that, when she is not working, she sleeps "a lot." (Tr. 528.) She sometimes spends an entire day sleeping, up to between 18 and 22 hours. (*Id.*) Ms. Bowen is stressed every day, sometimes to the point that she does not get out of bed for a day or more. (Tr. 534.) When she has the time, which "isn't often," she enjoys watching television, doing arts and crafts, and "interior decorating." (Tr. 533.)

Ms. Bowen said she tries to "force" herself to complete housework and yardwork, but "it's been extremely difficult." (*Id.*) She has had more pain, and her legs have become more "bothersome." (*Id.*) She is able to clean, but it takes her a long time to do and to perform other chores. (Tr. 532.) It takes her "weeks" to do laundry, and she mows the lawn over two or three days. (*Id.*) Sometimes her mother will come over to help her do chores. (*Id.*)

She used to cook "full meals" every day, but now she eats mostly frozen or prepared meals because it hurts her back and legs to stand at the stove for long periods. (*Id.*) She tries to work up the motivation to make better meals, and she tries to cook at least "one good meal" each week. (*Id.*)

Ms. Bowen indicated that she has no trouble seeing to her personal care and hygiene. (*Id.*) She cares for a cat, feeding her and playing with her in the evenings. (*Id.*) She tries to go outside every day and is able to drive and go out alone. (Tr. 529.) She shops for groceries and household items in person once a week for about three hours. (*Id.*) She goes resale shopping around once a month with her mother or "Nana." (Tr. 533.) That said, she does not like leaving the house. (*Id.*) She does not have friends, as her friends told her she has "multiple personalities" and lied to her

and stole from her. (*Id.*) Ms. Bowen feels like people are "out to get [her]," are talking about her, or are stealing from her. (Tr. 534.) She does not enjoy social events anymore. (Tr. 533.)

Ms. Bowen wrote that she cannot pay attention for longer than five minutes. (Tr. 530.) That said, she follows written instructions "pretty well," and her ability to follow spoken instructions is "fair," although she usually writes things down to avoid forgetting. (Tr. 530.) She tries to "get along with everyone" but is "not the best" at getting along with authority figures; she gets "really paranoid of people." (*Id.*) She has been fired because of problems getting along with others. (*Id.*)

Ms. Bowen reported that she had been hospitalized several times for stress and for suicidal attempts and ideation, during a period "in which I was lost and addicted to cocaine." (Tr. 534.)

In December 2022, Ms. Bowen's counsel wrote to the SSA, reporting that she had been diagnosed with tricuspid valve regurgitation and had begun treating with a cardiologist. (Tr. 546.) Counsel further reported that Ms. Bowen had been diagnosed with dissociative identity disorder. (*Id.*)

Ms. Bowen submitted a statement to the SSA reporting that she had "chronic fatigue" and stating that she "lose[s] grasp of reality quite often," "check[s] out," and has memory lapses every day. (Tr. 614.) She reported that she had been "pink slipped" for suicidal ideation in October 2024, writing that her "condition is worsening" especially with respect to her "memory issues." (Tr. 615.) She wrote that her fibromyalgia was causing widespread pain, and the arthritis in her spine was "horrible," such that she had been staying in bed three or four days per week. (*Id.*)

In an undated letter, Ms. Bowen's mother wrote to the agency about her daughter's case. (Tr. 652.) She recounted how Ms. Bowen had fallen ill, beginning to experience pain, which led to a diagnosis of uterine polyps and ultimately a hysterectomy. (*Id.*) She described that she saw "a steep decline in [Ms. Bowen's] attitude and overall happiness." (*Id.*) Ms. Bowen fell into a "deep

depression" and began abusing substances to cope. (*Id.*) The mother said that Ms. Bowen "is unable to work with others," reporting that Ms. Bowen had tried to work at the hotel the mother managed but was terminated "due to employee and guest complaints." (*Id.*) The mother reported seeing "manic episodes." (*Id.*)

In February 2025, Ms. Bowen wrote a letter to the agency reporting that she was in dire need. (Tr. 655.) She wrote that her mental and physical health had continued to decline. (*Id.*) She said she had "extreme difficulty getting along with others" and loses time throughout the day. (*Id.*) She reported chronic widespread pain from fibromyalgia, Ehlers–Danlos syndrome, vasoconstriction, and her knees being "bone on bone." (*Id.*) She said she experienced dizziness from postural orthostatic tachycardia syndrome and had "horrible headaches." (*Id.*) She discussed having food and housing insecurity and other financial stressors. (*Id.*)

### C.  Relevant Hearing Testimony

#### 1.  *Ms. Bowen's Testimony*

At the first hearing, Ms. Bowen testified that she underwent a hysterectomy and lost her fiancé within the same year as she lost her nursing license; this led her to have a "nervous breakdown." (Tr. 65.) She said that, for most of the jobs she has held since then, she did not stay longer than three months. (Tr. 68; *see also* Tr. 117–20.) She said that she was consistently late and did not get along with her coworkers; she does not "respect authority" well. (Tr. 86.) Ms. Bowen testified that she was terminated from the hotel front desk position after she "got[] into it verbally with" some of her coworkers. (*Id.*)

Ms. Bowen feels pain "all the time" due to her physical conditions, including fibromyalgia. (Tr. 73.) Ms. Bowen said that a doctor had given her a tentative diagnosis of fibromyalgia and instructed her to follow up with a rheumatologist, but she has not set up an appointment with the specialist. (Tr. 73–74.)

Ms. Bowen does not walk much. (Tr. 71.) She is able to stand for "maybe" 10 minutes before she must sit down and rest. (*Id.*) She can sit for up to two hours. (Tr. 71–72.) It often takes her a while to get out of bed because her "legs hurt so bad" and she feels "stiff and achy." (Tr. 75.)

She can lift about 20 pounds using both hands, but using her left arm alone she is not able to lift more than a gallon of milk. (*Id.*) She had been bitten by a dog in the left arm, which severed a nerve and caused other injuries. (Tr. 83–84.) She attended physical therapy for the arm, which was helping, but she could not continue with treatment because of transportation issues. (Tr. 84.) She would not be able to lift up to 20 pounds repetitively for multiple hours in a workday. (Tr. 82–83.) She does not have a strong grip on the left side, and reaching is difficult as a result of the bite injury. (Tr. 84–85.)

Ms. Bowen described daily pelvic pain and trouble urinating. (Tr. 80.) She has seen a specialist who recommended pelvic-floor therapy, and she has been diagnosed with pelvic congestion. (Tr. 81.) These conditions cause her legs to swell and hurt constantly. (Tr. 81.) She wears TED hose stockings or elevates her legs to help treat these conditions. (*Id.*) When she sits in a chair, she usually uses a footstool. (Tr. 81–82.)

Ms. Bowen also said she had arthritis in her spine and knee. (Tr. 83.) She has constant pain in her spine, all over but worse in her lumbar spine, where she has a "pseudo-sacralization." (Tr. 83–84.)

Despite these physical conditions, Ms. Bowen feels like she might be able to work if it were not for her mental health challenges, which had gotten "worse and worse" over time. (Tr. 74.) She has been experiencing hallucinations during "periods of psychosis." (Tr. 75.) Her treating professionals were discussing whether she has dissociative identity disorder or schizoaffective disorder. (*Id.*) Ms. Bowen described that she has "a lot of thoughts going on in [her] head all the

time." (Tr. 76.) It feels like "people are talking in my head all the time." (*Id.*) She called these voices her "alters." (*Id.*)

Ms. Bowen finds herself "lash[ing] out at people," and she sometimes does not remember what she says. (Tr. 85.) She tends to "dissociate a lot," going "blank" for hours or days. (*Id.*) She feels withdrawn, wanting to stay isolated and away from other people. (*Id.*)

Three or four days a week, Ms. Bowen does not get out of bed. (Tr. 75–76.) She wakes up, takes her medicine, and then goes back to sleep to allow the medication to begin working. (Tr. 76.) On days when she can get out of bed, Ms. Bowen gets up and eats. (*Id.*) After she eats, she will often go back to bed. (*Id.*) She will try to get things done throughout the day in between periods spent in bed, but she finds that she does not have the motivation to get a lot done. (*Id.*)

Ms. Bowen has been taking medicine for psychiatric conditions since she was 16 years old. (Tr. 72.) She has had inpatient psychiatric treatment approximately five times in her life, most recently in 2019. (Tr. 76–77.) At that time, she underwent inpatient treatment before attending substance use treatment at a rehabilitation clinic. (Tr. 77–78.) She has now been sober for years. (Tr. 75.)

Ms. Bowen currently takes medicine for anxiety, depression, and attention-deficit/hyperactivity disorder. (Tr. 72.) She finds the medication helpful. (*Id.*) She has seen a counselor once a week since January 2022. (Tr. 78–79.) She had previously treated with a counselor on and off for years. (Tr. 79.)

She currently lives alone in a house purchased by her mother. (Tr. 62.) She is able to manage her personal hygiene, dress herself, prepare food for herself, and complete household chores. (Tr. 79.)

Ms. Bowen became upset during the vocational expert's testimony, potentially reflecting a misunderstanding of the hearing procedure. (*See* Tr. 88–90.) After she interrupted the testimony, calling herself "stupid" and stating that she needed to be found disabled, the ALJ paused the hearing to allow Ms. Bowen to compose herself and speak with her lawyer. (Tr. 89.)

At the second hearing, Ms. Bowen's testimony about her conditions was materially similar to her description at the first hearing. Additionally, Ms. Bowen testified that her mother has been financially supporting her for the past two years. (Tr. 120.)

Ms. Bowen testified that she does not like to leave the house, so she typically only drives when she needs to go to a doctor's appointment. (Tr. 121.) She described herself as a "pretty good driver," but sometimes she does not remember how she got to a certain place. (Tr. 122.)

In addition to the work experiences Ms. Bowen previously described, she worked as a state tested nursing assistant before she became an LPN. (Tr. 123.) She also has phlebotomy training and significant experience drawing blood. (*Id.*)

Ms. Bowen testified that she received emergency care for mental health challenges in October 2023. (Tr. 124.) She refused to be admitted to the hospital, but she completed an assessment. (*Id.*) In addition to the 2019 hospitalization previously described, Ms. Bowen was hospitalized in 2017 for around five days and in 2015 for around five days. (Tr. 125.) In 2010, Ms. Bowen completed intensive outpatient treatment. (Tr. 125–26.)

Ms. Bowen attends weekly talk therapy, which she finds helpful. (Tr. 126.) She had been treating with a psychiatry practice for medication management, but she recently stopped treating with them after having a "disagreement" with her case manager. (Tr. 126, 128.) She described the dispute as a "cat fight" wherein "some of [her] personalities came out and it got kind of nasty." (Tr. 129.) She is searching for a new psychiatrist. (Tr. 128.)

Ms. Bowen was "on the fence" about whether her medications were helpful. (Tr. 127.) That said, when she stops taking her medication, she finds that she will "lose a lot of time" and "really twitch a lot." (*Id.*) She said when she does not take her medication, she has "really bad tremors" that feel like "spasms on [her] brain." (Tr. 128.) One of her new medications is causing her to retain water. (Tr. 127.)

Ms. Bowen has panic attacks and experiences flashbacks of past abuse. (Tr. 135.) She will "get really upset or overwhelmed" and vomit. (*Id.*) She has been having these panic attacks daily. (Tr. 136.) Without her ADHD medication, she would not be able to focus on anything. (*Id.*) She catches herself "dissociating," where she will "zon[e] out" and lose hours or days. (*Id.*)

Ms. Bowen described hearing voices. (Tr. 136–37.) She hears people yelling at her constantly. (*Id.*) When she is around other people, she "know[s] what people are saying . . . without them speaking" and she "can feel everybody's energy always." (*Id.*) She believes there is someone living above her house. (*Id.*) She "see[s] spirits." (*Id.*)

Ms. Bowen testified that she has a hard time getting along with other people. (Tr. 137.) She "curse[s] out" people often. (*Id.*) She described a recent incident where she "laid into" an employee at the food bank. (*Id.*)

At the second hearing, Ms. Bowen also spoke more about her physical conditions. She is "always in pain." (Tr. 129.) She has chronic neck and back pain; her knees "are bone-on-bone"; and her fibromyalgia causes widespread pain such that it is difficult to get comfortable. (Tr. 129–30.) She recently has experienced swelling and water retention, which has caused tricuspid valve regurgitation. (Tr. 130.) She has received injections in her back and knees. (Tr. 129.) She has had a procedure on her spine to "scrape[] out" the arthritis. (Tr. 130–31.) She was still having trouble with her left arm, even more than a year after the dog bite. (Tr. 131.) She can lift no more than a

10

gallon of milk. (*Id.*) She continued to have trouble urinating and was engaged in pelvic floor therapy. (*Id.*) She has an "overactive bladder." (*Id.*) She continued to experience symptoms from venous issues in her pelvis; she has May–Thurner syndrome and blockages. (Tr. 132.)

Ms. Bowen finds that she needs to change positions after sitting for five minutes. (*Id.*) She needs to stand up every 20 minutes. (*Id.*) She elevates her legs whenever she is sitting, and she is supposed to elevate them above her heart. (Tr. 133.)

Ms. Bowen has radiating pain throughout her legs and spine when she stands. (*Id.*) She cannot stand still in one place; she has to move around or rock on her feet. (*Id.*) She estimated that she can stand for 20 minutes before needing to sit down. (*Id.*) She finds herself lying down and sleeping a lot. (*Id.*) She estimated that she sleeps between 10 and 14 hours a day. (Tr. 138.) She has trouble walking long distances and often crawls up and down her stairs instead of walking. (Tr. 134.) She has trouble twisting her spine and picking objects up over her head. (*Id.*) She has trouble picking up and holding items due to her hand tremors. (*Id.*)

Ms. Bowen "put a garden in" over the summer, but she has not been able to maintain it because she cannot stand long enough or bend. (Tr. 134–35.) She also finds herself short of breath often. (Tr. 135.) Her mother will come over sometimes and help with household chores. (*Id.*) Ms. Bowen does her own grocery shopping, but she often shops online because she does not like leaving her house. (*Id.*)

### 2. *Vocational Experts' Testimony*

Paula Zinsmeister testified as a vocational expert (VE) at the first hearing. (Tr. 86.) She classified Ms. Bowen's past relevant work as that of a waitress (DOT 311.477-030), forklift operator (DOT 921.683-050), and licensed practical nurse (DOT 079.364-014). (Tr. 88.)

The ALJ asked the VE to assume that a hypothetical individual with Ms. Bowen's age, education, and work experience was limited to sedentary work with additional limitations. (Tr. 88.) Among a number of exertional and environmental limitations, the ALJ included certain non-exertional limitations. Specifically, they can perform simple, routine, and repetitive tasks but not at a production rate pace. (*Id.*) They can respond appropriately to occasional, superficial interactions with supervisors, coworkers, and the general public. (*Id.*) The ALJ defined "superficial interaction" to mean that the person can work in proximity to others, exchange greetings, and engage in simple, work related discussions, but they should never be responsible for persuading others or resolving conflict. (*Id.*) The ALJ provided that the hypothetical person would be capable of tolerating few changes in the work setting; their job duties should be routine and remain static, and the duties should be performed in a stable, predictable work environment. (*Id.*)

The VE testified that such a person could not perform any of Ms. Bowen's past relevant work but could perform the work of a document preparer (DOT 249.587-018), stem mounter (DOT 725.684-018), or sorter.[2] (Tr. 90–91.)

The ALJ next asked the VE to assume that the hypothetical person would be further limited, in that they would require the ability to elevate their legs using a small footstool throughout the day. (Tr. 91.) The VE confirmed that all three representative jobs would remain available to such a person. (*Id.*)

The ALJ then asked the VE to further limit the person, such that they would be unable to maintain sufficient concentration, persistence, and pace, which would cause them to be off task for 20 percent of the workday. (Tr. 91–92.) The VE testified that such a limitation would preclude any

---

[2] The VE cited "DOT 521.637-086" as the appropriate entry for "sorter" in the DOT. (Tr. 91.) But, as the Appeals Council later pointed out, there is no such code entry. (*See* Tr. 226–229.)

12

competitive employment. (Tr. 92.) Employers will tolerate less than 15 percent, but no higher. (*Id.*) Employers will allow no more than one absence per month on an ongoing basis. (*Id.*) There is typically no tolerance for absences or tardiness during a probationary period. (Tr. 94.)

Ms. Bowen's counsel then asked the VE to imagine that a hypothetical person would have trouble maintaining emotional stability and responding appropriately to instruction and criticism from supervisors, such that they would experience crying spells or lash out for 15 percent of the workday. (Tr. 93.) The VE confirmed that that would generally be work-preclusive if it occurred on an ongoing basis; employers may put an employee with these behaviors on suspension and then allow them to come back and show improvement. (*Id.*)

The VE testified that a request to work in isolation would be an accommodation. (*Id.*)

The VE described that a typical break schedule would include one 30 minute break at lunch and two 15 minute breaks, one in the morning and one in the afternoon. (*Id.*) If a person required extra breaks on an ongoing basis due to their physical or mental health symptoms, that would prevent them from maintaining regular employment. (Tr. 94.)

Michael Rosko testified as a vocational expert at the second hearing in this matter. (Tr. 139.) The ALJ asked the VE to assume that a hypothetical individual with Ms. Bowen's age and education was limited to work at the light exertional level with additional limitations. (Tr. 140.) Specifically, the person can never climb ladders, ropes, or scaffolds and can never kneel, crawl, or balance. (*Id.*) The person can occasionally stoop, crouch, and climb stairs or ramps. (*Id.*) The person must avoid all exposure to dangerous moving machinery and unprotected heights. (*Id.*) Further, the person's work must be able to be learned in 30 days or less and involve only simple, routine tasks and simple work-related decisions. (*Id.*) The person cannot work at a production rate pace or have hourly productivity goals. (*Id.*)

The ALJ's discussion of social interaction limitations reads as follows in the transcript:

> Occasional interaction with coworkers. No tandem tasks. Occasional interaction with supervisors after the initial training period. And occasional interaction with the general public.

(*Id.*)

The VE testified that such a person would be capable of performing work as a housekeeping cleaner (DOT 323.687-014), assembler (DOT 729.684-054), or inspector (DOT 727.687-062). (*Id.*)

The VE testified that, to maintain competitive employment, an employee must be on task for at least 90 percent of the workday except for scheduled breaks. (Tr. 141.) Typically, there will be a 10 to 15 minute break, then a lunch break of 30 to 45 minutes, then a 10 to 15 minute break after lunch. (*Id.*) The VE testified that, for the representative jobs he identified, a worker would have the flexibility to leave and use the restroom, because doing so would not disrupt other workers or cause other issues. (*Id.*) If an employee were to take frequent breaks such that they were off task for five to six minutes every hour, they would likely be dismissed. (Tr. 142.) An employee who misses one day per month on an ongoing basis would likely be dismissed at some point. (*Id.*)

The VE confirmed that an employee who does not interact appropriately with a supervisor will face "consequences." (Tr. 145.) The VE also testified that if a person needed to elevate their legs above their heart during the workday, that would be work-preclusive. (Tr. 146–47.) But it is not work-preclusive to use a footstool or elevate the legs to "hip height." (*Id.*)

### D.    <u>State Agency Consultants</u>

A disability examiner (Matthew Bass), a physician (James Cacchillo, M.D.), and a psychologist (Karla Delcour, Ph.D.) reviewed Ms. Bowen's claim at the initial review level. (Tr. 149–76.)

14

Dr. Delcour found that Ms. Bowen had no limitation in her ability to understand, remember, and apply information. (Tr. 155.) But she had moderate limitations with respect to her ability to interact with others; to concentrate, persist, and maintain pace; and to adapt and manage herself. (*Id.*) Dr. Delcour also found moderate limitations with respect to her ability to carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek at a consistent pace without interruptions or unreasonable breaks. (Tr. 159.) And the doctor opined that Ms. Bowen had moderate limitations with respect to her ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to changes in the work setting. (*Id.*)

Dr. Delcour explained that Ms. Bowen is capable of engaging in "acceptable superficial interactions with others, to include coworkers, bosses, and the general public." (*Id.*) The doctor found that Ms. Bowen is able to handle "simple, routine work-related tasks" on an ongoing and consistent basis. (Tr. 160.)

In further explaining these conclusions, Dr. Delcour acknowledged Ms. Bowen's statements about her limitations but noted that Ms. Bowen was currently working 16 hours a week as a hotel desk clerk and lives independently, seeing to her own self-care. (Tr. 159–60.)

In regard to Ms. Bowen's physical residual functional capacity, Dr. Cacchillo opined that Ms. Bowen had certain exertional and postural limitations. (Tr. 157.)

The consultants further noted that Ms. Bowen had a history of manipulative behaviors and medication seeking behaviors. (Tr. 156.) They wrote that her medical records reflected that "[s]ubstance abuse issues have significantly impacted [Ms. Bown's] mental stability." (*Id.*)

Based on these opinions, the agency consultants determined that Ms. Bowen retained the ability to perform certain light work, such as that required of a "marker, retail trade" (DOT 209.587-034), "electronics worker" (DOT 726.687-010), or "photocopying machine operator" (DOT 207.685-014). (Tr. 162.) They therefore found that she was not disabled. (*Id.*)

In a letter to Ms. Bowen explaining this decision, the Agency wrote that it expected that Ms. Bowen would be capable of maintaining sufficient concentration, persistence, and pace to complete simple, routine work-related tasks on a steady, ongoing, and consistent basis. (Tr. 241.)

A disability examiner (Hashem Ketaneh), physician (Gary Hinzman, M.D.), and psychologist (Jennifer Swain) reviewed Ms. Bowen's claim at the reconsideration level. (Tr. 178–202.)

Dr. Swain concluded that the findings at the initial review level, as it relates to Ms. Bowen's psychological symptoms and non-exertional limitations, were consistent with and supported by the record evidence. (Tr. 187.)

Dr. Hinzman found that the medical records supported greater physical limitations than those listed at the initial review level. (Tr. 184.) He opined on more restrictive lifting, pushing, and pulling limitations. (*Id.*)

Nevertheless, the agency consultants affirmed that Ms. Bowen retained the ability to perform the work of a retail trade marker, electronics worker, or photocopying machine operator. (Tr. 189.) They therefore affirmed that Ms. Bowen is not disabled. (Tr. 190.)

In a letter to Ms. Bowen explaining this decision, the Agency wrote that her psychological conditions, while severe, would not prevent her from performing all work activity. (Tr. 261).

### E.    Relevant Medical Evidence

The record in this case is extensive—nearly 2,400 pages long—but the issue presented for review is narrow. I will therefore focus this discussion on the records cited by the parties as relevant

to their positions on that narrow issue: whether substantial evidence supports the ALJ's decision to translate the state consultants' opined "superficial interaction" limitation into one requiring only occasional interaction with coworkers, supervisors, and the general public, with certain additional limitations.

Ms. Bowen underwent an adult diagnostic assessment with a licensed social worker in October 2015. (Tr. 658.) She had been required to complete the assessment during disciplinary proceedings related to her nursing license. (*Id.*) She presented with an anxious demeanor and a depressed and anxious mood; the social worker documented that Ms. Bowen had a panic attack. (Tr. 655.) The social worker noted "delusions" when asked to assess Ms. Bowen's thought content, but then immediately after wrote that Ms. Bowen did not exhibit delusions. (*Id.*) Ms. Bowen had a logical thought process and exhibited cooperative behavior. (*Id.*) The social worker wrote that Ms. Bowen had poor insight with respect to her problematic use of opioids. (*Id.*)

Ms. Bowen reported being "too outspoken" and said she was "not as patient . . . with others" as she should be. (*Id.*) She had a romantic partner, but no friends. (Tr. 658.) She said she attends church services "when she can." (Tr. 659.) She was employed part-time. (*Id.*) She reported a childhood physical fight. (Tr. 661.) Ms. Bowen endorsed daily anxiety that had been getting worse, but she denied anger, aggression, or oppositional behaviors. (Tr. 662.)

The social worker listed "panic disorder" and "attention deficit disorder" in her list of assessments. (Tr. 666.)

In June 2017, Ms. Bowen presented to a hospital emergency department and was admitted for inpatient treatment for suicidal ideation and a suicidal attempt; she had used a "large amount" of an illegal substance and had attempted to swerve her car into traffic. (Tr. 831–32.) She was hesitant to answer questions at the appointment. (Tr. 833.)

Ms. Bowen was treated with antidepressants during her inpatient stay, and her mood improved such that she was not experiencing suicidal ideations upon discharge five days later. (Tr. 839–40.)

At some point thereafter, Ms. Bowen voluntarily stopped taking her medication and began using the illegal substance again. (*See* Tr. 691.) In March 2018, she presented to a hospital emergency room stating that she wanted help with her depression and substance use and stating that she was again having suicidal ideations. (Tr. 690–91.) She reported being unhoused and said she had been staying at a "trap house." (Tr. 693.) She said she had homicidal thoughts "towards 'all people.'" (Tr. 694.) She admitted that she had not been compliant with her medications, but she expressed a willingness to become compliant. (*Id.*) Her behavior was cooperative. (Tr. 696.) She was admitted for behavioral health treatment, and the emergency medicine doctor noted an impression of depression with suicidal ideation. (Tr. 693.)

Ms. Bowen underwent a diagnostic assessment with Melchor L. Mercado, M.D., in a telehealth appointment on September 20, 2018. (Tr. 667.) Ms. Bowen reported that her substance use had affected her relationships with her peers, who also used drugs. (*Id.*) But she said she had a supportive sober friend. (*Id.*) She identified significant stressors in her life, but she denied mood swings or hyperactivity. (*See* Tr. 669.) She was assessed as cooperative and had a euthymic mood and full affect. (Tr. 670.) Dr. Mercado opined that Ms. Bowen met the diagnostic criteria for moderate and severe substance abuse disorders, among other things. (Tr. 671, 676.)

Ms. Bowen was admitted for inpatient treatment, and she was involuntarily discharged on January 4, 2019, for not making sufficient progress. (Tr. 677–78.) Treatment notes reflect that on one occasion she got "verbally aggressive" with a staff member, on another occasion she "call[ed] someone a name," and in general she said she did not want to continue services. (*See* Tr. 678.)

On August 8, 2022, Ms. Bowen consulted with Lora Meyers, LISW, for psychotherapy. (Tr. 1084.) Ms. Bowen reported that she had accidentally overdosed on an illegal substance in December 2021. (*Id.*) She reported childhood abuse and said she had been in an out of therapy since childhood. (*Id.*) She reported a history of suicide attempts since her teenage years. (*Id.*) She said she had been incarcerated for domestic violence, for an incident that occurred while she was under the influence of an illegal substance. (*Id.*) On examination, her interview behavior was appropriate and her mood was euthymic. (*Id.*) Ms. Meyers opined that Ms. Bowen exhibited several symptoms consistent with borderline personality disorder, including anger ("intense anger that may not fit the situation" or "angry outbursts"), a distorted and insecure concept of herself, an irrational fear of being abandoned, impulsive choices, and paranoid thoughts. (Tr 1086.)

When Ms. Bowen followed up with Ms. Meyers on August 16, 2022, Ms. Bowen reported that she was open to developing an outside support system. (Tr. 1087.) Ms. Meyers assessed that Ms. Bowen's interview behavior was appropriate; her mood was euthymic and the other mental examination findings were unremarkable. (*Id.*) Ms. Meyers recommended weekly therapy sessions. (Tr. 1088.)

On August 22, 2022, Ms. Meyers wrote a letter in support of Ms. Bowen's disability application. (Tr. 1083.) Ms. Meyers acknowledged that she had only seen Ms. Bowen twice and cautioned that she was "unable to determine how the client's mental health impacts [her] ability to work . . . ." (*Id.*) But Ms. Meyers wrote that Ms. Bowen had been diagnosed with borderline personality disorder characterized by intense anger, unstable relationships, a distorted concept of herself, impulsive behaviors, and paranoia. (*Id.*)

On September 29, 2022, Ms. Bowen underwent a consulting psychological evaluation over a videoconferencing platform with John S. Reece, Psy.D., for purposes of her disability

19

application. (Tr. 1091.) Ms. Bowen reported that she was living alone; she had previously lived with a romantic partner for two years before the relationship ended. (Tr. 1092.) She had then been romantically involved with another person "off and on" for a year. (*Id.*) She said she was in regular contact with her mother and had some contact with her brother. (*Id.*) She said that she had gotten along well with other students and teachers while in school, and she denied behavior problems. (*Id.*) She denied having problems with neighbors or authority figures. (*Id.*) She was involved in outpatient counseling. (Tr. 1093.) She described her mood as "pretty good" and said that she was not normally in a bad mood. (*Id.*) She endorsed crying spells and feelings of depression. (*See id.*) She said she experienced anxiety or nervous feelings when leaving her house or being in public. (*Id.*)

Ms. Bowen reported that she had been working 16 hours per week for the past four and a half months as a hotel desk clerk. (Tr. 1094.) She said that she had never been out of work for more than a year, although she had been fired many times for her "attitude" or her attendance. (*Id.*) She denied having problems with supervisors, but she said she has had arguments with coworkers. (*Id.*) She said that she was able to complete repetitive tasks and reported that she does not experience stress or pressure in the workplace. (*Id.*) She said she regularly socializes with her mother and grandmother, and sometimes with her ex-partner. (*Id.*)

Throughout the examination, Ms. Bowen displayed "very mild agitation," but her eye contact was good, her tone of voice was normal, and she was cooperative. (Tr. 1095.) Dr. Reece assessed that Ms. Bowen was "able to live independently, make important decisions about her future, and seek appropriate community resources." (Tr. 1096.) Dr. Reece listed diagnostic impressions including an unspecified mood disorder, post-traumatic stress disorder, and several

substance abuse disorders. (*Id.*) Dr. Reece opined that Ms. Bowen was able to follow directions in the examination and had no problems with concentration on examination. (Tr. 1097.)

Ms. Bowen consulted with Ms. Meyers on October 18, 2022. (Tr. 1820.) Ms. Bowen's interview behavior was appropriate, but her thought content was noted to be "Delusions: Persecutory." (*Id.*) The treatment plan was for Ms. Bowen to continue with weekly therapy to decrease mood intensity and increase her "sense of self." (Tr. 1821.)

Ms. Bowen continued meeting with Ms. Meyers. According to treatment notes, Ms. Bowen at times displayed continued persecutory delusions (*see* Tr. 1822 (October 27, 2022)), fearfulness (*see* Tr. 1824–25 (November 3, 2022) (expressing concerns about her physical health and fears of dying, although with a normal mental status examination)), and an anxious mood and difficulty dealing with past traumas (*see* Tr. 1835–36 (December 19, 2022) (normal mental status, except for an anxious mood, and expressing apprehension about being near a dog after her bite injury)).

Lori Greer, a certified family nurse practitioner, wrote a letter in support of Ms. Bowen's disability application on December 21, 2022. (Tr. 1250.) Ms. Greer wrote that Ms. Bowen had been treating with her practice since January 2022 and had "PTSD not only from dog attack, but past trauma." (*Id.*) Ms. Greer wrote that Ms. Bowen sees a therapist and has diagnoses of "anxiety, PTSD, panic attacks, depressive disorder, ADHD and personality disorder"; she recommended that the Agency reach out to Ms. Meyers for more information. (*Id.*) Ms. Greer wrote that Ms. Bowen reported difficulty working with others. (*Id.*) The record contains a second copy of this letter, dated on January 4, 2023. (Tr. 1252.)

At an appointment with Ms. Meyers on January 2, 2023, Ms. Bowen was assessed as having an anxious mood, but otherwise her mental status examination was normal. (Tr. 1838.)

Ms. Bowen presented with an anxious mood at a therapy appointment with Ms. Meyers on March 27, 2023. (Tr. 1860.) Otherwise, her mental status examination was unremarkable. (*Id.*) Ms. Bowen said that she was "feeling overwhelmed by her emotions." (Tr. 1861.) After talking through these issues, she reported a "significant decrease in distress." (*Id.*) Ms. Bowen said that "feeling alone . . . is impacting her self worth." (*Id.*)

When Ms. Bowen met with Ms. Meyers on April 6, 2023, Ms. Bowen again presented with an anxious mood. (Tr. 1863.) Her mental status examination was otherwise normal, including in that she exhibited normal behavior. (*Id.*) Ms. Bowen reported "flashbacks" and "aggression in one of her relationships." (Tr. 1864.)

Ms. Bowen presented with a depressed mood at her therapy appointment on April 27, 2023. (Tr. 1872.) Ms. Meyers assessed Ms. Bowen's interview behavior as "hostile." (*Id.*) Ms. Bowen reported hearing a deceased friend's voice "talking to her through the radio," and she discussed periods of "dissociation and instability of self." (Tr. 1873.)

Ms. Bowen presented as "hostile" again at her therapy appointment on May 4, 2023. (Tr. 1875.) But she said she was "feeling better," and she expressed a willingness to undergo inpatient treatment if that would help her. (Tr. 1876.)

Ms. Meyers continued to list "hostile" in Ms. Bowen's mental status examinations through July 2013; Ms. Bowen was at times also "irritable." (*See* Tr. 1878, 1881, 1884, 1887, 2269, 2271, 2275, 2277, 2279.) But these appointments largely focused on Ms. Bowen's feelings regarding her doctors changing her pain medication to suboxone, and Ms. Meyers noted that Ms. Bowen was in active withdrawal from opioids. (*See* Tr. 1879, 1882, 1885.) Suboxone significantly helped Ms. Bowen's withdrawal symptoms, and Ms. Bowen reported an improvement in her mood as the withdrawal symptoms ebbed. (*See* Tr. 1888, 2270, 2272.) She reported some conflict with family

"following [a] wedding." (Tr. 2270.) She was late to two appointments after "getting her car worked on," and during one appointment she reported that on one occasion she felt a "demon" had attacked her. (Tr. 2276–77.) Ms. Bowen was ultimately removed from the suboxone program after the program recommended residential treatment, and Ms. Meyers confronted Ms. Bowen about the need to be in additional services related to her substance use. (Tr. 2278, 2280.)

In an undated letter, Ms. Bowen's chiropractor wrote that he believed Ms. Bowen's "mental impairments inhibit her ability to understand, remember, and carry out instructions, maintain concentration, persistence or pace, and respond appropriately to supervision, coworkers, and work pressures." (Tr. 854.)

## IV.    THE ALJ'S DECISION

After the first hearing, the ALJ issued a decision finding that Ms. Bowen is not disabled. (Tr. 206–19.) In relevant part, the ALJ limited Ms. Bown to "occasional, superficial interaction with supervisors, co-workers, and the general public (defined as able to work in proximity to others, to exchange greetings, and to engage in simple, work-related discussions, but should never be responsible for persuading or resolving conflict among others)." (Tr. 213.)

After the remand and the second hearing, the ALJ issued the controlling decision in this matter, the findings of which are set forth below.

The ALJ found that Ms. Bowen met the insured status requirements of the Social Security Act through June 30, 2026. (Tr. 27.) The ALJ next found that Ms. Bowen had engaged in substantial gainful activity after the disability onset date. (*Id.*) But the ALJ found that there were periods of more than 12 months without substantial gainful activity; the ALJ addressed her decision to those periods. (*Id.*)

The ALJ next determined that Ms. Bowen had the following severe impairments: (1) osteoarthritis of the knees; (2) obesity; (3) bipolar disorder; (4) borderline personality disorder;

and (5) schizoaffective disorder. (*Id.*)

The ALJ further found that Ms. Bowen had several non-severe impairments: (1) osteoarthritis of the knee;[3] (2) disorders of the spine; (3) fibromyalgia; (4) pelvic pain; and (5) polysubstance abuse. (*Id.*)

The ALJ determined that none of Ms. Bowen's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 30.)

The ALJ determined that Ms. Bowen had the residual functional capacity ("RFC") to perform light work with a number of additional limitations. (Tr. 38.) Specifically, Ms. Bowen can only occasionally climb stairs or ramps, stoop, and crouch. (*Id.*) She can never kneel, crawl, or balance. (*Id.*) She can never climb ladders, ropes, or scaffolds, and she must avoid all exposure to dangerous moving machinery and unprotected heights. (*Id.*)

In terms of non-exertional limitations, the ALJ limited Ms. Bowen to simple, routine tasks and simple work-related decisions. (*Id.*) Her work cannot involve hourly productivity goals or a requirement to perform at a production rate pace (like on an assembly line). (*Id.*) Ms. Bowen is able to occasionally interact with coworkers and the general public. (*Id.*) She would not be able to complete tandem tasks. (*Id.*) After an initial training period, Ms. Bowen can tolerate only occasional interaction with supervisors. (*Id.*) The ALJ further provided that Ms. Bowen's work must be able to be learned in 30 days or less. (*Id.*)

The ALJ found that Ms. Bowen had no past relevant work. (Tr. 44.) She found that Ms.

---

[3] While Ms. Bowen's physical impairments are not the subject of this appeal, I note that the ALJ's conclusions regarding Ms. Bowen's knees are internally inconsistent. The ALJ determined that osteoarthritis of the knees was both a severe and a non-severe impairment. (Tr. 27.) The ALJ specifically reasoned that—while Ms. Bowen testified about severe limitations from this condition—"neither the exams nor the diagnostic testing support the alleged severity regarding her knees." (Tr. 28.)

Bowen had at least a high school education. (*Id.*)

The ALJ then determined that—considering Ms. Bowen's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform, including work as an "assembler" (DOT 729.684-054) or "inspector" ((DOT 727.687-062) (Tr. 45.) Accordingly, the ALJ determined that Ms. Bowen is not disabled. (*Id.*)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

25

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.     Standard for Disability

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P,

Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her

from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C.   **Analysis**

In her assignment of error, Ms. Bowen argues that the ALJ erred when crafting the RFC, in that the ALJ did not adequately account for the state psychologists' opinions that she is limited to superficial interaction with supervisors and with the general public. She acknowledges that the ALJ included a "superficial-like" limitation with respect to coworkers. (*See* Pl.'s Merits Br. at 9, ECF No. 7, PageID# 2407–08.) But she says that including such a limitation was inconsistent with the ALJ's reasoning as it relates to coworkers. She next argues that the ALJ did not include superficial-like limitations as it relates to supervisors and the public, and she says the ALJ did not adequately explain the reasons for omitting such a limitation. She challenges the ALJ's limitation regarding a "brief training period" as unsupported. She then argues that the ALJ's reasoning cannot be readily traced, leaving the Court unable to discern the basis for the ALJ's RFC decisions. And finally, she argues that—to the extent the reasoning can be traced—the RFC is not supported by substantial evidence.

The Commissioner defends the ALJ's decision, characterizing the RFC as "consistent with, or more restrictive than," the limitations found by the agency consultants. (Comm'r Merits Br. at 1, 6–7, ECF No. 10, PageID# 2416, 2421–22.) The Commissioner argues that any error, therefore, would be harmless. (*Id.* at 7, PageID# 2422.)

In reply, Ms. Bowen argues that the Commissioner misreads the RFC, and in fact the ALJ did not limit the quality of her interactions with supervisors or the public. (Reply Br. at 1–2, ECF No. 11, PageID# 2427–28.)[4]

---

[4] Ms. Bowen refers to "the Magistrate Judge" throughout her reply brief—*see, e.g.*, Reply Br. at 3, PageID# 2428 ("Similarly, the Magistrate Judge believed that the no tandem tasks applied to everyone and

After careful consideration, I agree with the Commissioner that the ALJ's RFC adequately accounted for the opined "superficial" limitation. I am further convinced that the ALJ adequately explained her reasons for reaching the RFC she did. And I am convinced that the RFC is supported by substantial evidence.

The state agency consultants found that Ms. Bowen had a moderate limitation in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 159, Tr. 187 (affirming).) But they found no significant limitation in Ms. Bowen's ability to ask simple questions or to request assistance. (*Id.*) They further found no significant limitation in Ms. Bowen's ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes (*Id.*) And they found no significant limitation with respect to her ability to maintain socially appropriate behavior. (*Id.*)

The consultants then opined as follows:

> She is expected to be capable of engaging in acceptable superficial interactions with others, to include coworkers, bosses, and the general public.

(*Id.*)

The ALJ included social interaction limitations in the RFC, providing as follows:

> Occasional interaction with coworkers, no tandem tasks, occasional interaction with supervisors, after the initial training period, and occasional interaction with the general public.

(Tr. 38.)

---

therefore no error occurred.")—but in context and in light of the procedural posture of the case, it seems this was merely a mistake. Ms. Bowen cites to the Commissioner's brief, leading me to conclude that she meant "the Commissioner." *See id.* at 2, PageID# 2427 (citing to the Commissioner's merits brief when discussing how "the Magistrate Judge" read the ALJ's decision).

The ALJ also limited Ms. Bowen to work that can be learned within 30 days and provided that the work must involve only "simple, routine tasks" and "simple work-related decisions." (*Id.*) The ALJ specified that the work cannot involve hourly productivity goals or a requirement to perform at a production rate pace. (*Id.*)

While the ALJ did not include the word "superficial" in the RFC, an ALJ is not required to adopt the verbatim wording of an opined limitation in the RFC finding. *E.g.*, *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). Social Security Ruling ("SSR") 98-6p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996).

The first question, then, is whether the RFC here actually conflicted with the state consultants' opinions. There is good reason to conclude that it did not.

The term "superficial interaction" is not defined in the governing regulations. *See, e.g.*, *Lopez v. Comm'r of Soc. Sec.*, No. 1:22-CV-01801, 2024 WL 1580101, at *19 (N.D. Ohio Apr. 11, 2024) (collecting cases). There is general—although not universal—agreement that a limitation to "superficial interaction" is a limitation on the depth or quality of one's interactions, as opposed to the frequency of interactions. *See, e.g.*, *Haahr v. Comm'r of Soc. Sec.*, No. 3:23 CV 2159, 2024 WL 5242214, at *3 (N.D. Ohio Dec. 30, 2024.)

Here, as the ALJ noted, the state agency consultants did not define what they meant by "superficial interactions." Indeed, the ALJ expressed concern that "superficial . . . is not vocationally defined" in the agency opinions and therefore "does not adequately articulate the limitations" for use in an RFC assessment. (Tr. 36.) But the ALJ nevertheless found the opinions "partially persuasive." (*Id.*)

The ALJ offered several reasons for this determination. The ALJ first explained that the opinions "are now rather remote." (*Id.*) This was a reasonable observation, as the opinions were rendered in October 2022 (initial level) and January 2023 (reconsideration level), whereas the ALJ issued her decision in January 2025. (Tr. 21, 161, 188.)

The ALJ then found that the opinions "are somewhat inconsistent." (Tr. 36.) The ALJ noted that the consultants had found that Ms. Bowen had no limits in her ability to understand, remember, and apply information, but then opined that she only retains the ability to complete short and simple instructions and make simple work-related decisions. (*Id.*; compare Tr. 182 with Tr. 186–87.) The ALJ also noted that the consultants had found Ms. Bowen not significantly limited in the ability to be punctual and sustain an ordinary routine, yet they found moderate limitations in her ability to complete a normal workday and perform at a consistent pace. (*Id.*; Tr. 186.)

Most relevant to the arguments presented in this case, the ALJ noted that the consultants found no significant limitation in Ms. Bowen's ability to get along with coworkers and peers without exhibiting behavioral extremes, to maintain socially appropriate behavior, and to work in coordination with or in proximity to others, yet they found moderate limitations in her ability to complete a normal workday, interact with the general public and supervisors, and respond to changes in the workplace. (*Id.*; Tr. 186.)

The ALJ acknowledged that the consultants limited Ms. Bowen to "acceptable superficial interactions with others to include coworkers," but noted that that opinion "is internally inconsistent with their finding [that] she was not significantly limited in dealing with coworkers as noted . . . ." (Tr. 36.)

The ALJ thus found the "superficial" limitation "persuasive only insofar as it indicates there are limitations in the area of interaction with supervisors[] and the general public," in light of the identified internal inconsistency with respect to coworkers. (*Id.*)

Despite noting these and other inconsistencies, the ALJ wrote that she had "included wording in the [RFC] assessment that is vocationally appropriate and includes limits noted by the State agency," such that a vocational expert would be able to testify about the effect of those limits. (*Id.*)

There is no indication in the ALJ's decision that she was rejecting the consultants' opinions as it relates to Ms. Bowen's ability to interact with supervisors and the general public. While the ALJ found the opinions not persuasive as it relates to Ms. Bowen's interactions with coworkers, the ALJ ultimately included limitations in her ability to interact with coworkers—she can only interact with them occasionally, and she cannot complete tandem tasks. (Tr. 36.) Ms. Bowen complains that this RFC limitation was inconsistent with the ALJ's reasoning, but any inconsistency benefitted her. This can be, at most, harmless error. *See Nichol v. Comm'r of Soc. Sec.*, No. 5:18 CV 1795, 2019 WL 4305767, at *12 (N.D. Ohio Sept. 11, 2019) (finding harmless error where the ALJ adopted a more restrictive limitation than that opined by the agency consultants).

It is clear, then, that the ALJ felt that she had adequately accounted for the "superficial" limitation in her RFC, with respect to supervisors, coworkers, and the general public. The next question, then, is whether the RFC actually does account for such a limitation. Again, I am convinced that it does.

Courts have held that a limitation to no team or tandem tasks is sufficient to account for a doctor's opinion that an individual be limited to superficial interaction with others. *See Wieman v.*

*Comm'r of Soc. Sec.*, No. 3:22 CV 1045, 2023 WL 5541597, *3 (N.D. Ohio Aug. 29, 2023); *see also Kearns v. Comm'r of Soc. Sec.*, No. 3:19 CV 1243, 2020 WL 2841707, at *12 (N.D. Ohio Feb. 3, 2020), *report and recommendation adopted*, 2020 WL 2839654 (N.D. Ohio June 1, 2020).

Both parties acknowledge this caselaw, but Ms. Bowen tries to distinguish them because—she says—in her case the ALJ applied the "no tandem tasks" limitation only to coworkers. In her view, the RFC would allow tandem tasks with supervisors, although she admits that "it is difficult to even consider what types of tandem tasks an employee would perform side-by-side with a supervisor[;] [i]t is difficult to understand what tandem tasks they could potentially perform together." (Reply Br. at 3, ECF No. 11, PageID# 2428.)

The Commissioner reads the RFC to exclude tandem tasks of any kind. While the ALJ could have more clearly stated whether the limitation applied only to coworkers or applied more generally, the Commissioner has the better argument. The ALJ included the "no tandem tasks" limitation immediately after the occasional-interaction-with-coworkers limitation, and she set off all these limitations with commas in her opinion. It is not an unreasonable reading of the RFC to apply the no-tandem-tasks limitation only to coworkers. But looking to the ALJ's examination of the VE at the hearing, the record seems to reflect that she considered the no-tandem-tasks limitation to be a separate limitation not specifically tied to coworkers. The ALJ asked the VE to limit the hypothetical individual as follows:

> Occasional interaction with coworkers. No tandem tasks. Occasional interaction with supervisors after the initial training period. And occasional interaction with the general public.

(Tr. 140.)

While the Commissioner has the better argument—on this record—about the ALJ's intent with the no-tandem-task limitation, this may be a distinction without a difference.

In many cases dealing with a no-tandem-task limitation, the ALJ more clearly applied the limitation to all others (*i.e.*, supervisors and coworkers alike). *See, e.g.*, *Kearns*, 2020 WL 2841707, at *6 (N.D. Ohio Feb. 3, 2020) ("He can have occasional interaction with supervisors and coworkers with no team or tandem tasks."); *Romo v. Comm'r of Soc. Sec.*, No. 3:20-CV-1557-JGC, 2021 WL 5040385, at *7 (N.D. Ohio July 9, 2021) ("He is limited to no tandem work."), *report and recommendation adopted*, 2021 WL 4437062 (N.D. Ohio Sept. 28, 2021).

But in at least one case, this Court held that a no-tandem-task limitation—applicable only to coworkers—was sufficient to account for a doctor's opinion that the claimant be limited to superficial interaction with "others" more generally. *See Wieman v. Comm'r of Soc. Sec.*, No. 3:22 CV 1045, 2023 WL 5541597, *2–3 (N.D. Ohio Aug. 29, 2023).

In *Wieman*, the agency psychologists had limited the claimant in a general way, stating that the claimant was capable of "working superficially with others." *Wieman*, 2023 WL 5541597, at *2. The ALJ adopted an RFC limiting the claimant to "occasional interaction with supervisors and co-workers, but should have no team or tandem work with co-workers and no interaction with the general public." *Id.* at *2. In appealing that decision to this Court, the claimant argued that the RFC did not account for the opinion that his interactions with supervisors needed to be superficial. *Id.* at *2. He further argued that, to the extent the ALJ had rejected the opinion as it relates to supervisors, there was no explanation supporting that decision. *Id.*

The court disagreed, noting that courts have repeatedly held that a limitation to no team or tandem tasks is sufficient to account for a physician's opinion that an individual be limited to superficial interaction with others more generally. *See id.* at *3.

Even if Ms. Bowen is correct, then, that the ALJ in her case applied the no-tandem-task limitation only to coworkers, *Wieman* and the line of cases leading to it would support the

34

conclusion that the limitation would still be sufficient to account for the agency consultants' opinions.

It is true that, in *Wieman*, the ALJ had also limited the claimant from all interaction with the general public. *Id.* at *2. Here, in contrast, the ALJ has allowed Ms. Bowen to have occasional interaction with the public. (Tr. 38.) But that should not change the conclusion, especially under the facts of Ms. Bowen's case.

This Court addressed a similar situation in *Duma-Quigley v. Comm'r of Soc. Sec.*, No. 3:22 CV 917, 2023 WL 3016861 (N.D. Ohio Apr. 20, 2023). There, the agency consultants had opined that the claimant could interact with others on a "brief, infrequent, and superficial basis." *Duma-Quigley v. Comm'r of Soc. Sec.*, No. 3:22 CV 917, 2023 WL 3322755, at *7 (N.D. Ohio Mar. 28, 2023), *report and recommendation adopted as modified*, 2023 WL 3016861 (N.D. Ohio Apr. 20, 2023). The ALJ adopted an RFC limiting the claimant to "occasional interaction with the general public, supervisors and coworkers with no team or tandem tasks." *Duma-Quigley*, 2023 WL 3016861, at *2.

The claimant argued on appeal that the RFC spoke only to interactions with coworkers but not to interactions with supervisors—or the general public. *Id.* at *4. In rejecting this argument, the court held (among other things) that the RFC adequately accounted for the claimant's mental limitations. *Id.*

The court relied on the line of cases holding that a limitation to no team or tandem tasks "properly account[s] for a limitation on superficial interactions with others." *Id.* (citing *Kearns v. Comm'r of Soc. Sec.*, No. 3:19 CV 1243, 2020 WL 2841707, at *12 (N.D. Ohio Feb. 3, 2020), *report and recommendation adopted*, 2020 WL 2839654 (N.D. Ohio June 1, 2020); *Romo v.*

35

*Comm'r of Soc. Sec.*, No. 3:20-CV-1557-JGC, 2021 WL 5040385, at *7 (N.D. Ohio July 9, 2021), *report and recommendation adopted*, 2021 WL 4437062 (N.D. Ohio Sept. 28, 2021).

While the no-tandem-task limitation, standing alone, may be sufficient to account for the agency consultants' "superficial" limitation here, there are additional reasons to find that it does under the circumstances of this case.

The court in *Wieman* reasoned that a combination of restrictions (there, occasional interaction with supervisors; only simple, routine, and repetitive tasks; few changes in the work setting; and "infrequent[] and . . . easily explained" changes) can sufficiently encompass a superficial interaction limitation. *Wieman*, 2023 WL 5541597 at *3 (citing *Carver v. Colvin*, 600 F. App'x 616, 620 (10th Cir. 2015) (superficial interaction adequately accounted for, where the claimant was limited to simple instructions and interacting with coworkers and supervisors "under routine supervision," because "[i]nteracting with supervisors in the course of routine supervision over simple work is tantamount to the 'superficial' interaction typically encountered in jobs involving such work.").

Here, the ALJ translated the "superficial interaction" limitation into a combination of restrictions. Ms. Bowen can only occasionally interact with coworkers, supervisors, and the public, with no tandem tasks. (Tr. 38.) Additionally, these interactions must occur in a workplace that meets more restrictions. Specifically, the ALJ restricted Ms. Bowen to jobs than can be learned in less than a month; that involve no more than simple, routine tasks; that require nothing more than simple work-related decisions; and that involve nothing more than routine workplace changes. (*Id.*)

I am convinced that this combination of restrictions adequately accounted for the opinions of the state agency consultants. The consultants did not define what they meant by "superficial

interaction," but they found only a moderate limitation in Ms. Bowen's ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 159, Tr. 187 (affirming).) They explicitly found no significant limitation in Ms. Bowen's ability to ask simple questions or to request assistance. (*Id.*) They further found no significant limitation in Ms. Bowen's ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes (*Id.*) And they found no significant limitation with respect to her ability to maintain socially appropriate behavior. (*Id.*)

I am convinced that the ALJ's RFC does not outright contradict these opinions, even though the RFC does not include the word "superficial." More importantly, the RFC is supported by substantial evidence.

At step two of the sequential evaluation, the ALJ found that Ms. Bowen has a moderate limitation in her ability to interact with others. (Tr. 35.) The ALJ reasoned as follows:

> In an examination, she stated she socializes regularly in-person with her mother and grandmother, and sometimes in- person with her ex-significant other. . . . She stated she was with a significant other, in which they cohabitated, for two years before the relationship ended. She stated she has regular contact with her mother, and has some contact with her brother. She reported her current source of income at the time of the consultative psychological evaluation was from work; and she receives financial support from her mother . . . . As thoroughly discussed above, her treating sources mostly note her as cooperative. There is no evidence to support a finding the claimant has marked or extreme limits in this criterion.

(Tr. 35.)

And throughout the decision, the ALJ referred to evidence relevant to the consideration of Ms. Bowen's ability to interact with others. The ALJ acknowledged those times that Ms. Bowen was admitted to the hospital, and thoroughly summarized her treatment history (Tr. 32–35, 38–41), while also noting that she "remained able to engage in substantial gainful activity . . . during 2021, as well as work [in] all other years, albeit under [SGA] levels." (Tr. 32.) The ALJ noted that

Ms. Bowen reported "continuing to feel more like herself" and said she was working full-time in 2022. (*Id.*) The ALJ acknowledged that a treatment note from October 2022 documented "persecutory delusions," while also noting that Ms. Bowen then reported that medication and therapy had been helpful and that she had a normal mental status and a cooperative attitude through appointments between November 2022 and February 2023. (Tr. 33.) The ALJ noted relatively routine treatment through 2022 and 2023, with "relatively normal . . . mental examination findings" and pointed out those points in the record where Ms. Bowen reported that she was working full time. (Tr. 43.)

In arguing that the ALJ's conclusions were not supported by substantial evidence, Ms. Bowen points to those records documenting aggression (Tr. 1864) and hostility (Tr. 1872, 1875, 1878, 1881, 1884, 1887, 2269, 2271, 2275, 2277, 2279). I also note that Ms. Bowen was reportedly terminated from a hotel job based on complaints from coworkers and customers. (Tr. 86, 652.)

But Ms. Bowen fails to acknowledge that these appointments also show that her irritability and hostility largely occurred in correlation with significant withdrawal symptoms. (*See* Tr. 1879, 1882, 1885.) Ms. Bowen reported an improvement in her mood as the withdrawal symptoms ebbed. (*See* Tr. 1888, 2270, 2272.)

The ALJ thoroughly discussed the evidence upon which Ms. Bowen relied. (Tr. 31–34, 38–44.) The ALJ considered Ms. Bowen's testimony and function reports. (*Id.*) The ALJ explained, with citations to the record, that Ms. Bowen's impairments do not render her unable to interact occasionally with supervisors, coworkers, and the public in a job consistent with the combination of other limitations set forth in the RFC. The ALJ cited instances where Ms. Bowen reported socializing regularly with her mother and grandmother, and sometimes with her ex-partner. The ALJ pointed out that Ms. Bowen had cohabited with a partner for two years. The ALJ noted that

Ms. Bown had some contact with her brother. The ALJ pointed out that her treating providers routinely found that Ms. Bowen exhibited a cooperative attitude. And the ALJ noted that Ms. Bowen had sustained substantial gainful activity for a portion of the alleged period of disability, and some work (below SGA levels) at various points over the years.

I am convinced that a reasonable mind might accept this evidence, and the other evidence the ALJ cited in her decision, as adequate to support the conclusion that Ms. Bowen is able to have occasional interaction with coworkers, supervisors, and the public in a work setting consistent with the other limitations set forth in the RFC.

Before concluding, I note that I am not convinced that the ALJ failed to adequately set forth her reasoning when translating the opined "superficial interaction" limitation into the RFC. An ALJ's reasoning need not be contained in "tidy packaging." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x. 674, 678 (7th Cir. 2010). The decision must be read as a whole and with common sense. *E.g.*, *id.; see also Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, at *8 (N.D. Ohio Sept. 30, 2021). Ms. Bowen argues that "it is impossible to discern exactly what the ALJ was referring to as evidence that a [superficial limitation] was not supported by the record . . . ." (Pl.'s Merits Br. at 9, ECF No. 7, PageID# 2407.) But when crafting the RFC, the ALJ explicitly referred to her reasoning at step two (*see* Tr. 44), and she thoroughly discussed the evidence relevant to Ms. Bowen's social interaction limitations throughout her decision. Reading the decision as a whole and with common sense, the ALJ's reasoning is adequately traceable such that this Court can afford a meaningful review.

I am also convinced that substantial evidence supported the ALJ's conclusion that Ms. Bowen could perform work with more than occasional interaction with supervisors during an initial training period. "[T]he Commissioner's decision cannot be overturned if substantial

evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

This case is distinguishable from the case Ms. Bowen cites, C*lampit v. Comm'r of Soc. Sec.*, 3:22CV1561, 2023 WL 2958158, at *6 (N.D. Ohio Mar. 30, 2023), *report and recommendation adopted in part and rejected in part*, 2023 WL 2956613 (N.D. Ohio Apr. 14, 2023). There, the ALJ provided no explanation for making a distinction between the claimant's abilities before and after a training period. *Id.* Here, in contrast, reading the ALJ's decision as a whole and with common sense, the ALJ adequately explained why Ms. Bowen could tolerate more than occasional interaction with supervisors during a brief training period. The ALJ noted that Ms. Bowen had sustained SGA for a portion of the alleged disability period, and other work in the remaining years. The ALJ noted that the agency consultants had opined that Ms. Bowen had no significant limitation in her ability to ask simple questions, to request assistance, to get along with coworkers and peers without exhibiting behavioral extremes, and to maintain socially appropriate behavior.

I am convinced that a reasonable mind might accept this evidence as adequate to support the ALJ's conclusion that Ms. Bowen can complete a brief training period—in a job requiring no more than simple, routine tasks and simple work-related decisions, and with no hourly productivity goals—with more than occasional interaction with supervisors.

In sum, I find that the ALJ properly explained her RFC limitations and accounted for the state agency opinions, including the "superficial interaction" restrictions. I further find the resulting social interaction limitations in the RFC to be supported by substantial evidence.

Accordingly, I recommend that the Court overrule Ms. Bowen's assignment of error.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: February 20, 2026        /s *Jennifer Dowdell Armstrong*
                                         Jennifer Dowdell Armstrong
                                         U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be

specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).